**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

STEVEN BROWN,                        )
                                     )
            Petitioner,              )
                                     )
      v.                             )            16 C 10249
                                     )
VICTOR CALLOWAY, Warden, Danville    )
Correctional Center,                 )
                                     )
            Respondent.              )

## MEMORANDUM OF OPINION

**CHARLES P. KOCORAS, District Judge:**

Before the Court is Petitioner Stephen Brown's ("Brown") Petition for Writ of Habeas Corpus ("Petition"). For the following reasons, Brown's Petition is denied, and the Court declines to issue Brown a certificate of appealability ("COA").

## BACKGROUND

The following facts are drawn from the Illinois Appellate Court's statement of facts on direct appeal. *People v. Brown*, 2014 IL App (1st) 121750-U (unpublished). Because Brown has not contested the state appellate court's findings nor rebutted them with clear and convincing evidence, the court's findings are "presumed to be correct." 28 U.S.C. § 2254(e)(1).

In 2009, Brown was convicted following a bench trial in the Circuit Court of Cook County, Illinois, of predatory criminal sexual assault, aggravated criminal

sexual assault, and additional convictions later vacated on direct appeal. Acting *pro se* pretrial, Brown filed motions alleging *Miranda*, ex post facto, and double jeopardy violations, alongside an allegation that the State failed to give him adequate notice of the charges. The trial court denied his ex post facto and double jeopardy claims on the merits and scheduled a hearing for the *Miranda* claims. The *Miranda* hearing was struck after Brown accepted representation of counsel, who withdrew all *pro se* motions.

The victim ("L.W."), Brown's granddaughter, who was nine years old at the time of the offense, testified that on February 9, 2007, she, her ten-year-old sister ("D.W."), and their younger brother spent the afternoon with Brown, an electrician, at several of his worksites. This was not unusual, according to L.W. At one work site that afternoon, Brown told L.W.'s siblings to stay in the car while he took L.W. alone into a building. Once inside, Brown put his coat on the floor and ordered L.W. to lay down on the coat. Brown took off his pants, instructed L.W. to remove her pants, and then got on top of her, where he "put his long thing" on her "private part." Brown was breathing heavily and touched his private part to L.W.'s for a few minutes. L.W. never saw Brown's penis, but she confirmed that she felt it.

Brown stopped rubbing against L.W. when he got up to answer a call on his cell phone from D.W. Brown and L.W. got dressed and began walking to the car. As they walked, Brown looked at L.W., put a finger over his mouth, and told her, "don't tell nobody." L.W. did not speak to her siblings in the car-ride about the episode.

Once home, L.W. told her mother ("Geneva"), who is also Brown's daughter, what happened. Geneva took L.W. to the hospital, where she underwent an examination and reported what happened to medical personnel, police officers, and Children's Advocacy Center employees.

D.W. confirmed L.W.'s testimony that Brown took the children to the work site that day and brought L.W. into the building alone. As D.W. waited, her mother called her cell phone. D.W. told Geneva that Brown was in a building with L.W. and that they had been there for a long time. D.W. also confirmed that L.W. talked to Geneva when they arrived home. When D.W. asked her sister what happened, L.W. pointed to her "private part" and responded that Brown was "feeling on her" and "made her lay on him."

Geneva confirmed that Brown picked up her children that day and took them to do some repairs at her uncle's church. When Brown did not return the children at the expected time, Geneva called Brown and D.W. on their cell phones. When Brown dropped off the children, Geneva asked him why he did not answer the phone, why he was gone so long, and why he was alone with L.W. in a building. Brown provided no direct answers. After he left, Geneva took L.W. to the hospital.

Barbara Doherty ("Doherty"), a registered nurse with sexual assault training, testified that she examined L.W. at the hospital. L.W. informed Doherty that Brown removed both of their pants, instructed her to lie on top of him, and then kissed her on her lips. Brown then kept "pushing" his private parts against L.W.'s, "touching the

outside of her private parts" with his "private parts." Doherty collected L.W.'s clothing, vaginal, anal, and inner thigh swabs, and a blood sample. Doherty noted that L.W. arrived at the hospital without underwear and had what appeared to be dried secretions on her inner thighs. Doherty provided all of the samples in a sealed sexual assault kit to a Chicago police officer.

Doctor Nadhi Kukreja ("Kukreja"), a pediatric resident, testified that he performed a sexual assault examination on L.W. Kukreja confirmed that L.W. had recounted to him substantially the same account as she had to Doherty, that there was what appeared to be a moist smear on L.W.'s inner thigh, and that Doherty collected the samples as she testified to. Kukreja also noted no obvious signs of trauma or injury to L.W.

Detective Greg Grandon ("Grandon"), a member of the Chicago Police Department's Special Investigations Unit, testified that he met with Brown the day after the assault. Grandon *Mirandized* Brown, who then agreed to speak with him. Brown denied any type of sexual conduct with L.W. and asserted that his daughter Geneva and his then-wife, Michelle Brown ("Michelle"), had fabricated the story. Brown stated that he believed Geneva and Michelle had taken a used condom of his and saved its contents in the refrigerator or freezer. Brown believed that Michelle had discovered his affairs with other women and speculated that she wanted to punish him. Brown was cooperative with Grandon and agreed to provide a buccal sample.

Greg Didomenic, a forensic scientist and DNA coordinator for the Illinois State Police, testified that he obtained a sexual assault kit of L.W.'s and the swabs each tested positive for semen. Janet Youngsteadt, a forensic scientist with the Illinois State Police, testified that Brown's DNA could not be excluded as the male donor of the DNA found on L.W.'s vaginal swab and that Brown's DNA profile was conclusively determined to be present on L.W.'s rectal and inner thigh swabs.

Brown called Michelle, his ex-wife and L.W.'s grandmother, as his only witness. Michelle testified that, on the evening of the assault, she drove to the hospital after receiving a call from her daughter Geneva. When Michelle returned home, she immediately had the locks changed. She also sought and obtained an order of protection against Brown, effectively prohibiting him from returning to their home, and initiated divorce proceedings. Michelle denied threatening to send Brown to jail, did not recall overhearing her daughter threaten Brown, and denied saving Brown's semen to plant as evidence against him.

Except as to two not-guilty findings on charges of criminal sexual abuse and criminal sexual assault predicated on the use of force, after conducting a bench trial, the trial court found Brown guilty and sentenced him to concurrent prison terms of twenty-eight, fifteen, and seven years.

On February 7, 2013, Brown's appellate counsel filed a brief seeking vacatur of six of Brown's seven convictions as violative of Illinois' one-act, one-crime doctrine.

Appellate counsel also challenged as impermissible several factors the trial court considered at sentencing.

On February 27, 2013, Brown requested permission to file a supplemental *pro se* brief, alleging: (1) his *Miranda* rights were violated; (2) the evidence was insufficient to support his conviction; (3) double jeopardy was violated per the civil order of protection that preceded his criminal charges; (4) indictment and ex post facto violations base on insufficient notice of the charges and Brown's contention that the Illinois Criminal Code was invalid; and (5) trial counsel was ineffective. On March 8, 2013, the state appellate court denied Brown's motion seeking leave to file the supplemental brief, noting that it had already received a counseled brief.

On June 11, 2014, the Illinois Appellate Court rejected Brown's argument that the trial court had considered impermissible sentencing factors, but it vacated five of Brown's convictions and remanded for resentencing in light of the one-act, one-crime doctrine. On May 27, 2015, the Illinois Supreme Court denied Brown's petition for leave to appeal. Brown was resentenced on June 23, 2016, to concurrent prison terms of seventeen and seven years. Brown did not appeal from resentencing or seek collateral review in state court.

On October 31, 2016, Brown filed a 28 U.S.C. § 2254 petition for writ of habeas corpus, forwarding eight claims: (1) he was denied the right to proceed *pro se* in his direct appeal; (2) the State failed to advise him of his *Miranda* rights; (3) the evidence was insufficient to support conviction; (4) his convictions violate the double

jeopardy prohibition per the civil order of protection that preceded his criminal convictions; (5) his convictions violate the ex post facto clause because the Illinois Compiled Statutes are invalid; (6) the charging document failed to provide adequate notice of the charges; (7) he was denied effective assistance of trial counsel because (a) counsel had a conflict of interest, (b) counsel failed to properly investigate, (c) counsel's advice to waive Brown's right to testify and to a jury trial was deficient, and (d) counsel should have raised Claims 2, 4, 5, and 6 at trial; and (8) appellate counsel's failure to raise Claims 2 through 7 on direct appeal demonstrate ineffective assistance of counsel.

## DISCUSSION

### I. Claim 1 – Brown's Right to Self-Representation on Direct Appeal

There is no federal constitutional right to self-representation on direct appeal from a criminal conviction. *Martinez v. Court of Appeal of Cal., Fourth Appellate Dist.*, 528 U.S. 152, 163 (2000). Therefore, Brown's claim that he was denied the right to proceed *pro se* in his direct appeal cannot sustain a § 2254 petition. Claim 1 is denied.

### II. Procedural Default – Claims 2 Through 7

In its recent decision in *Clemons v. Pfister*, 845 F.3d 816 (7th Cir. 2017), the Seventh Circuit decided a case of eminently similar posture to the instant matter. In *Clemons*, the petitioner appealed for review of the trial court's denial of his postconviction petition. *Id*. at 818. Appellate counsel for the petitioner briefed a

single claim regarding evidentiary error.  The petitioner then filed a *pro se* motion setting forth a *Strickland* ineffective assistance of trial counsel claim to supplement his appellate counsel's brief.  The appellate court said it would take the *pro se* brief with the merits of the appeal.  *Id*.

The appellate court issued a merits order affirming denial of the postconviction petition, addressing only the arguments raised in the petitioner's counseled briefs and making no mention of the *pro se* brief.  *Id*.  The merits order was followed with a clarifying order noting that the *pro se* brief was denied and only the counseled brief was considered in the Illinois Appellate Court's decision-making process.  The case then moved to federal court, where the district judge denied the petition in its entirety for reasons mostly unrelated to the Seventh Circuit's narrow holding on appeal.  *Id*. at 819.

In its review, the Seventh Circuit noted that procedural default can occur "if the state court rejects a federal claim based on a state procedural rule 'that is both independent of the federal question and adequate to support the judgment.'"  *Id*. (quoting *Richardson v. Lemke*, 745 F.3d 258, 268 (7th Cir. 2014)).  The Illinois Appellate Court's refusal to consider the *pro se* brief in its ruling was a proper enforcement of the Illinois rule against hybrid representation.  *Id*.; *see People v. Serio*, 357 Ill.App.3d 806, 815 (2005) ("An accused has the right either to have counsel represent him or to represent himself; but a defendant has no right both to self-representation and the assistance of counsel").  The Seventh Circuit held that the state

appellate court's enforcement of the hybrid representation bar in *Clemons* was "an independent and adequate state ground of decision and precludes federal habeas review" of the *Strickland* claim set forth in the petitioner's unconsidered *pro se* supplemental brief. *Clemons*, 845 F.3d at 820.

Here, Brown's habeas petition is by-and-large procedurally indistinguishable from that under review in *Clemons*. Facial differences do exist: Brown seeks review of his direct appeal, *Clemons* involved a postconviction appeal; Brown's *pro se* brief was categorically excluded from consideration at the state level, the *Clemons* petitioner's was initially taken with the counseled brief before being excluded from the merits order.

But these minor procedural peculiarities are irrelevant in light of the merits of the Seventh Circuit's decision. Brown set forth Claims 2 through 7 in his proposed supplemental brief on state-level appeal, just as the *Clemons* petitioner set forth a *Strickland* claim in his supplemental brief at the state level. The Illinois Appellate Court declined to entertain Brown's brief where his counsel had already filed an opening brief, just as it declined to entertain the *Clemons* petitioner's. Finally, as in *Clemons*, Brown had the opportunity to "dispense with his counseled briefs and represent himself to ensure that his preferred arguments were raised, or he could roll the dice and hope that the court would make an exception to the rule against hybrid representation and accept his *pro se* supplemental brief." *Clemons*, 845 F.3d at 820. He declined to do so, and under the newly minted Seventh Circuit *Clemons* decision,

is precluded from federal habeas review of the claims he raised in his unconsidered *pro se* brief on direct appeal, Claims 2 through 7.

## III.  Merits Review

Our procedural decision barring review of Claims 2 through 7 turns on the validity of *Clemons*, which was recently docketed for review by the Supreme Court. To account for the possibility of *Clemons'* reversal, we address the merits of Brown's habeas petition, as well.

This case arises under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified at 28 U.S.C. § 2254.  Pursuant to § 2254(d), "federal courts may not grant relief on any claim adjudicated on the merits by a state court unless the adjudication 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States,' or 'resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding.'"  *Blackmon v. Williams*, 823 F.3d 1088, 1099 (7th Cir. 2016).

"Under the 'contrary to' clause, a federal court may issue a writ of habeas corpus if the state court applied a rule that 'contradicts the governing law' set forth by the Supreme Court or if the state court reached a different outcome based on facts 'materially indistinguishable' from those previously before the Supreme Court." *Morgan v. Hardy*, 662 F.3d 790, 797 (7th Cir. 2011) (quoting *Williams v. Taylor*, 529 U.S. 362, 405—06 (2000)).  Under the "unreasonable application provision," "a

federal court may grant habeas relief if the state court correctly identified the governing legal principle from the Supreme Court's case law but unreasonably applied it to the facts of the petitioner's case," *Blackmon*, 823 F.3d at 1099, or "unreasonably refused to extend a rule to a context where it should have applied." *Morgan*, 662 F.3d at 797. "This is a high standard: to grant relief, the state court's decision must be objectively unreasonable, not merely incorrect." *Blackmon*, 823 F.3d at 1099; *see also Schultz v. Page*, 313 F.3d 1010, 1015 (7th Cir. 2002) (quotation marks omitted) ("The state court decision is reasonable if it is minimally consistent with the facts and circumstances of the case").

## A. Claim 2 – *Miranda* Violations

Brown contends that statements he made while in custody were improperly introduced at trial because they were acquired without Brown having first been read his rights as required by *Miranda v. Arizona*, 384 U.S. 436 (1966). Grandon, however, testified that he *Mirandized* Brown prior to questioning and collecting Brown's buccal sample. Brown's *Miranda* form, signed by Brown, Grandon, and another officer, was also introduced at trial. Moreover, Brown's pretrial allegations of *Miranda* violations were withdrawn by trial counsel, who declined to object to Grandon's testimony or the admission of Brown's signed *Miranda* form. This is the record before the Court. Brown's bald claim in his petition that "he was never ask[ed] to sign or force[d] to sign, it never happened!" falls short of the clear and convincing evidence we require to rebut the presumption of correctness afforded the findings and

proceedings of the state courts. 28 U.S.C. § 2254(e)(1). The Illinois Appellate Court's factual recitation as well as the trial court transcripts indicate that Brown waived his rights after being properly *Mirandized*; his claim insisting otherwise lacks a factual and meritorious basis.

Additionally, even if Brown did not waive his *Miranda* rights, we agree with Calloway that any error caused by the admission of Brown's statements to Grandon was harmless. *See Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (holding that habeas merits review abides by a deferential, "less onerous" harmless-error standard).

First, any challenge to the admission of the buccal sample amounts to a Fourth Amendment search and seizure contest, not a *Miranda* issue. "[H]abeas review of Fourth Amendment claims is reserved for instances where the state court made an egregious error (e.g., failed to apply Supreme Court precedent directly on point after the argument was clearly presented), thus effectively depriving the petitioner of the ability to vindicate his federal rights in state court." *Turentine v. Miller*, 80 F.3d 222, 226 (7th Cir. 1996). Nothing of the sort is even alleged to have occurred here, and Brown's inclusion of the buccal sample in his *Miranda* claim is improper.

Second, the evidence of Brown's guilt, absent his statements to Grandon, was overwhelming. Brown's claimed inadmissible discussion with Grandon included his denial of the assault, his account that his wife and daughter conspired to collect and then plant his semen, and his statements about taking his children to work that day and on previous days. Such admissions are of meager weight in the face of the "very

difficult, sad testimony" of a nine-year-old girl, recounting her sexual assault at the hands of her biological grandfather. Indeed, L.W.'s testimony alone may have been enough to render inconsequential the admission of Brown's statements to the police. That her account was corroborated by the testimony of her sister, her mother, her grandmother, two forensic scientists, and physical evidence is more than enough to satisfy the Court that Brown's statements to the police did not have a "substantial and injurious effect or influence" on the verdict. *Brecht*, 507 U.S. at 637 (quoting *Kotteakos v. U.S.*, 328 U.S. 750, 776 (1946)).

## B. Claim 3 – Evidence Insufficient to Support the Conviction

For sufficiency of the evidence claims, we ask "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

Brown was convicted of predatory criminal sexual assault and aggravated criminal sexual abuse. At the time of his conviction, predatory criminal sexual assault required proof that "the accused was 17 years of age or over and commit[ed] an act of sexual penetration with a victim who was under 13 years of age when the act was committed." 720 ILCS 5/12-14.1(a)(1) (West 2006). The term "sexual penetration" was defined as "any contact, however slight, between the sex organs...of one person and an object or sex organ...of another person, or any intrusion, however slight, of

any part of the body of one person…into the sex organ…of another…. Evidence of semen is not required to prove sexual penetration." 720 ILCS 5/12-12(f) (West 2006).

L.W.'s testimony about the contact between her and Brown's "private parts" was more than sufficient for a factfinder to find slight contact between sex organs. Moreover, her credibility was thoroughly bolstered by corroborating testimony throughout trial. Brown's arguments that the State failed to prove that any "penetration" occurred, that L.W.'s "hymen was intact," and that there were "no injuries whatsoever" are irrelevant to the crime for which he was convicted.

Brown's conviction for aggravated criminal sexual abuse required proof that the "accused committ[ed]…an act of sexual conduct with a victim who was under 18 years of age when the act was committed and the accused was a family member." 720 ILCS 5/12-16(b) (West 2006). "Sexual conduct" was defined as:

> [A]ny intentional or knowing touching or fondling by…the accused, either directly or through clothing, or the sex organs…of the victim or the accused, or any part of the body of a child under 13 years of age, or any transfer or transmission of semen by the accused upon any part of the clothed or unclothed body of the victim, for the purpose of sexual gratification. 720 ILCS 5/12-12(e) (West 2006).

The facts recited *infra* establish that Brown was shown at trial to have committed potentially numerous acts of sexual conduct, from the intentional touching of bodies and sex organs to the transfer of semen. Brown's claim that his then-wife and daughter schemed to plant his semen on L.W. was presented at trial and evaluated by the factfinder. It was certainly rational for the judge to have discounted Brown's

conspiratorial allegation in the face of overwhelming evidence to the contrary. For both Brown's predatory criminal sexual assault and aggravated criminal sexual abuse convictions, a rational factfinder could have found the essential elements of the crime beyond a reasonable doubt.

### C. Claim 4 – Double Jeopardy

Following his sexual assault of L.W. and based in part upon the assault, Brown's then-wife Michelle took out a civil order of protection against him. Brown claims that, because the order of protection punished him for his acts with L.W., his subsequent conviction for sexually abusing her violated the prohibition against double jeopardy.

While the Supreme Court has recognized that the double jeopardy prohibition prevents states from "punishing twice, or attempting a second time to punish criminally, for the same offense," *Witte v. United States*, 515 U.S. 389, 396 (1995), no controlling authority has addressed head-on the issue at bar: whether a civil order of protection amounts to criminal punishment such that the subsequent prosecution of the conduct that lead to the protection order triggers double jeopardy concerns. However, precedent closely related to the issue – established almost a decade prior to Brown's trial – indicates that double jeopardy considerations do not contemplate civil orders of protection.

In *Kansas v. Hendricks*, 521 U.S. 346, 353—54 (1997), the cross-petitioner was nearing the end of a ten-year prison stint when the State of Kansas filed a petition

seeking his civil confinement as a sexually violent predator.  After a jury concluded that he was a sexually violent predator, the cross-petitioner was civilly committed to the custody of the Secretary of Social and Rehabilitation Services, where he would remain until he was deemed "safe to be at large." *Id.* at 354—56.  Commitment under the relevant statute was "involuntary," "potentially indefinite," and subject to "procedural safeguards traditionally found in criminal trials." *Id.* at 351, 363, 364. Nonetheless, the Court held that because the cross-petitioner was unable to provide "'the clearest proof' that 'the statutory scheme [was] so punitive either in purpose or effect as to negate the State's intention' to deem it 'civil,'" his civil confinement to the custody of the State did not rise to the level of criminal punishment. *Id.* at 361 (quoting *United States v. Ward*, 448 U.S. 242, 248—49 (1980)).

That the Court in *Hendricks* declined to construe a statute so eerily reminiscent of punitive criminal law as criminal-in-effect demonstrates the precariousness of Brown's contention.  A civil order of protection neither imposes involuntary confinement, as did the act under review in *Hendricks*, nor mimics the safeguards associated with criminal proceedings. *See* 750 ILCS 60/214.  But just like the civil confinement in *Hendricks*, a protection order by its very nature is concerned not with punishment.  Rather, it manifests to protect other individuals from potential danger.

Therefore, the state court's decision to reject Brown's double jeopardy concerns hewed to the tenets of favorable Supreme Court precedent, precedent that remains in effect to render Brown's claim wanting.  Because Brown's order of

protection was "civil in nature" and "not tantamount to punishment," his subsequent prosecution and conviction did not violate the ban against double jeopardy. *Hendricks*, 521 U.S. at 369.

### D. Claim 5 – Ex Post Facto

It is not entirely clear what Brown specifically contends was a violation of the Ex Post Facto clause. Brown's petition alleges that he was prosecuted "under a statutory provision which does not exist." Calloway notes that it appears Brown is contesting the validity or applicability of "the Illinois Compiled Statutes 1992 as amended," which might point to the source of Brown's confusion, since the laws were once codified under the name "Illinois Revised Statutes." In any event, as the trial court explained, none of Brown's attacks on the laws or lack thereof are consistent with the record before the Court, nor implicate the Ex Post Facto Clause in any meaningful way.

"The Constitution forbids the passage of ex post facto laws, a category that includes 'every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed.'" *Peugh v. U.S.*, 133 S.Ct. 2072, 2077—78 (1937) (quoting *Calder v. Bull*, 3 U.S. 386, 390 (1798)). Nothing in Brown's argument alleges the passage or enforcement of a subsequent law that affected the laws under which he was prosecuted and convicted. The record cites to then-applicable criminal laws in the Illinois Compiled Statutes that were charged, litigated, and adjudicated at trial. Brown was sentenced in keeping with those statutes

and their corresponding sentencing provisions. Neither the record nor Brown's Petition supports grounds for an ex post facto challenge.

### E. Claim 6 – Failure to Provide Adequate Notice of the Charges in the Charging Document

As Calloway hints at, the issues Brown raises concerning the notice he received of his indictment are, at best, conspiratorial, if not outright incoherent. Brown claims that the charging document was "misleading and misguiding" and caused Brown to be sent to an address "that does not exist," that the Illinois Compiled Statutes referenced in the indictment had been "held unconstitutional," and that the indictment violated the one-act, one-crime rule.

Brown's indictment plainly identifies his charges, with proper statutory citations, for predatory criminal sexual assault and aggravated criminal sexual abuse. The charges allege unambiguous facts to support the charges. Upon Brown's request, he was given by the State a bill of particulars that provided the six-hour time range in which the crimes took place and the specific address of the crime scene. Brown points to nothing in the record and our review reveals nothing to support his allegations that the charging document was misleading or that it caused him to be sent to a nonexistent address. The indictment was adequate to apprise Brown of "the elements of the offense charged" and of "the charges against which he must defend," issued with sufficient particularity to enable Brown "to plead an acquittal or

conviction in bar of future prosecutions for the same offense." *Hamling v. U.S.*, 418 U.S. 87, 117 (1974).

Finally, having already dispensed with his unfounded attack on the Illinois Compiled Statutes, we note that Brown has already litigated his one-act, one-crime allegations with rather resounding success. The majority of his convictions were stricken on direct appeal as violations of this very doctrine. For Brown to allege now that the only two remaining convictions are now similarly violative, after the Illinois Appellate Court's prior finding in Brown's favor on the issue following its own thorough analysis of the law, is disingenuous and unfounded. The charging document was sufficient to satisfy due process concerns, and Brown's contentions to the contrary are meritless.

### F. Claim 7 – Ineffective Assistance of Trial Counsel

As stated *supra*, Brown's ineffective assistance of trial counsel amounts to the following: (a) counsel had a conflict of interest, (b) counsel failed to properly investigate, (c) counsel's advice to waive a jury trial and the right to testify was deficient, and (d) counsel should have raised Claims 2, 4, 5, and 6 at trial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984) sets forth the governing defective assistance of counsel standard:

> First, the defendant must show that…counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing

that counsel's errors were so serious as to deprive the defendant of a fair trial….

### a. Conflict of Interest

Normally, a conflict of interest claim arises "when one attorney represents two or more defendants in the same criminal proceeding." *Stoia v. U.S.*, 22 F.3d 766, 770 (7th Cir. 1994). Brown does not allege that to be the case here, instead suggesting the "divergent interests" of he and his trial counsel, which can ground a defective assistance analysis under either the Strickland standard or that of *Cuyler v. Sullivan*, 446 U.S. 335 (1980). *Id.* "*Cuyler* requires a showing of both an actual conflict of interest and an adverse effect on the lawyer's performance." *Stoia*, 22 F.3d at 770 (internal quotation marks omitted). "Not surprisingly…most defendants…proceed under *Cuyler*, because it is significantly easier to demonstrate 'adverse effect' than to show 'prejudice.'" *Id.* at 771.

Here, Calloway argues that Brown declined in his Petition to specify the nature of trial counsel's alleged conflict of interest. However, a close reading of the Petition reveals that Brown believes that his request at trial for representation from an office other than that of the public defender "cause[d] more conflict between me and counsel, before, during, and after trial." However, other than to state in conclusory fashion that this was a conflict that led to defective assistance, Brown makes no attempt to explain how this demonstrated his and his counsel's divergent interests or conflict of interest. Moreover, the record reveals nothing in the way of

contentiousness or neglectful lawyering on trial counsel's behalf, nor that there was "a reasonable likelihood that counsel's performance somehow would have been different," absent Brown's request for different representation. *Id.* The Court finds no evidence demonstrating that trial counsel's interests in the case in fact conflicted with Brown's. His defective assistance of counsel claim on this ground is devoid of merit.

### b. Failure to Properly Investigate & Trial Advice

Brown's second and third allegations are only arguably discernible as separate contentions. Moreover, Brown's allegations that trial counsel failed to properly investigate and deficiently advised Brown to waive his rights to testify and to a jury trial are overwhelmingly conclusory in nature. Indeed, Brown frequently tethers his failure to investigate language to his plethora of complaints about trial counsel's strategy in objecting at trial, counsel's management and argument of motions before, during, and after trial, and the advice to Brown to waive his jury and testimonial rights. But "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonably professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690—91.

Brown does not address whether his trial counsel actually investigated the law and facts surrounding his strategic decisions at trial. Nor does he allege the effect his

testimony would have had in the face of overwhelming evidence of his guilt.  Brown similarly declines to explain why the bench trial prejudiced him or why a jury trial would have benefitted him.  Instead, Brown rests on the conclusion that "all the advice not to take the stand – switch to bench trial and the trial strategy proved to be the incompetence of this trial counsel."  But Brown's conviction by a reasonable factfinder speaks only to Brown's guilt; it does not automatically raise the post hoc presumption that the strategic decisions his trial counsel made prior to that conviction were defective.  Brown martials the "failure to investigate" language not in service of the substance of such a claim, but to lend a legal air to his complaints about the machinations of trial procedure that preceded his confinement – complaints that are insufficient to substantiate an ineffective assistance of counsel claim.

### c.  Failure to raise Claims 2, 4, 5, and 6

The Court has already concluded that Claims 2, 4, 5, and 6 are devoid of merit. "Failure to raise a losing argument, whether at trial or on appeal, does not constitute ineffective assistance of counsel."  *Stone v. Farley*, 86 F.3d 712, 717 (7th Cir. 1996).

### G. Claim 8 – Ineffective Assistance of Appellate Counsel

Calloway notes that a broad construction of Claim 8, reading the Petition as a whole, lends itself to an interpretation that Brown alleges ineffective assistance of counsel for failing to raise Claims 2 through 7 on direct appeal.  In the Court's reading of the Petition, no such broad construction is required, for that is precisely what Brown is alleging.  Indeed, Brown flatly equates appellate counsel with trial counsel,

asserting that each is responsible for identical Constitutional violations. Again, "[f]ailure to raise a losing argument, whether at trial or on appeal, does not constitute ineffective assistance of counsel." *Stone*, 86 F.3d at 717.

## CERTIFICATE OF APPEALABILITY

A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)2. Because Brown has not shown that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right" nor "that jurists would find it debatable whether [the Court] was correct in its procedural ruling," we decline to issue a COA. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

## CONCLUSION

For the aforementioned reasons, the Court denies Brown's Petition and declines to issue a COA.


Date: 11/29/2017

_____
Charles P. Kocoras
United States District Court Judge